# EXHIBIT B

STATE OF NEW YORK
SUPREME COURT OF THE COUNTY OF NASSAU
----------------------------------------------------------------
Bay Park Center for Nursing & Rehabilitation LLC d/b/a
 Bay Park Center for Nursing & Rehabilitation LLC, Brookhaven
Heath Care Center LLC d/b/a Brookhaven Rehabilitation & Health
Care Center LLC, Caring Family Nursing
& Rehabilitation Center d/b/a New Surfside Nursing Home LLC,
Eastchester Rehabilitation & Health Care Center d/b/a Eastchester
Rehabilitation & Health Care Center LLC, Golden Gate Rehabilitation
& Health Care Center d/b/a Golden Gate Rehabilitation & Health Care
Center LLC, Grace Plaza Nursing and Rehabilitation Center d/b/a
Pinegrove Manor LLC, Nassau Rehabilitation & Nursing Center
d/b/a Nassau Operating Company, LLC, Park Avenue Extended
Care Facility d/b/a Park Avenue Operating Company, LLC, South
Point Plaza Nursing and Rehabilitation Center d/b/a Bayview Manor
LLC, Spring Creek Rehab & Nursing Care Center d/b/a Willoughby
Rehabilitation & Health Care Center LLC, The Hamptons Center for
Rehabilitation and Nursing d/b/a North Sea Associates, LLC, Throgs
Neck Rehabilitation & Nursing Center d/b/a Throgs Neck Operating
Company, LLC, and Townhouse Center for Rehabilitation and Nursing
d/b/a Townhouse Operating Company,
      Plaintiffs

-against-

Bent Philipson, Avi Philipson and Deborah Philipson,
     Defendants

Oriska Corporation and Oriska Insurance Company, LLC,
    Intervenor-Plaintiffs

Avalon Gardens Rehabilitation & Health Care Center, LLC,
Bay Park Center For Nursing And Rehabilitation, LLC,
Bayview Manor LLC, - South Point Plaza
Brookhaven Rehabilitation And Health Care Center, LLC,
Eastchester Rehabilitation And Health Care Center, LLC,
Garden Care Center, Inc.,
Golden Gate Rehabilitation And Health Care Center LLC,
Highgate LTC Management, LLC D/B/A, Northwoods Rehabilitation &
Extended Care – Hilltop, d/b/a Northwoods Rehabilitation & Extended Care-
Rosewood D/B/A Northwoods Rehabilitation & Extended Care – Troy
Little Neck Care Center, LLC, And Little Neck Nursing Home LLC,

**COMPLAINT IN
INTERVENTION**
Oneida County Index
001276/2020,
Nassau County Index
609877/2019 Index

Case 2:20-cv-06291-GRB-ARL   Document 1-3   Filed 12/29/20   Page 3 of 23 PageID #: 22

Nassau Operating Co. LLC, - Nassau Rehab & Nursing
Kingsbridge Heights Receiver
New Surfside Nursing Home, LLC -Caring Family Nursing & Rehab
NMC Acquisition, LLC (Nathan Miller)
North Sea Associates, LLC, - The Hamptons Center
Park Avenue Operating Co. LLC,
Pinegrove Manor II, LLC,- Grace Plaza
Throgs Neck Extended Care Facility Family And Friends Association, Inc.,
Throgs Neck Operating Co. LLC
Townhouse Operating Co. LLC,- Townhouse Center For Nursing
West Lawrence Care Center, LLC
White Plains For Nursing Care LLC
Willoughby Rehabilitation And Health Care Center LLC, - Spring Creek
Shorefront Operating, LLC (Seagate)
Woodmere Rehabilitation And Health Care Center Inc.,
Woodmere Rehabilitation And Health Care Center Inc.,
Niskayuna Operating Co., LLC
Troy Operating Co., LLC (Diamond)
Parkview Care & Rehabilitation Center,
Little Neck Care Center, LLC, And Little Neck Nursing Home LLC,
Parkview Care & Rehabilitation Center,
        Intervenor Employer-Defendants





[redacted]

Intervenor Owner-Defendants

Uninsured Employers Fund,

Intervenor UEF-Defendant

[redacted]



Case 2:20-cv-06291-GRB-AKT   Document 1-3   Filed 12/29/20   Page 5 of 23 PageID #: 24

Case 2:20-cv-06291-GRB-AKT   Document 1-3   Filed 12/29/20   Page 6 of 23 PageID #: 25



Case 2:20-cv-06291-GRB-AKT   Document 1-3   Filed 12/29/20   Page 7 of 23 PageID #: 26



Case 2:20-cv-06291-GRB-AKT   Document 1-3   Filed 12/29/20   Page 8 of 23 PageID #: 27



Intervenor Employee-Defendants

----------------------------------------------------------------------

Case 2:20-cv-06291-GRB-ARL   Document 1-3   Filed 12/29/20   Page 9 of 23 PageID #: 28

## COMPLAINT IN INTERVENTION

Intervenor, Oriska Corporation ("OCorp") alleges by this complaint in intervention, to be filed by leave of court, that OCorp, join with the plaintiffs, Bay Park Center for Nursing & Rehabilitation LLC,  Bay Park Center for Nursing & Rehabilitation LLC, Brookhaven Rehabilitation & Heath Care Center LLC, Caring Family Nursing & Rehabilitation Center d/b/a New Surfside Nursing Home LLC, Eastchester Rehabilitation & Health Care Center, Golden Gate Rehabilitation & Health Care Center, Grace Plaza Nursing and Rehabilitation Center d/b/a Pinegrove Manor LLC, Nassau Rehabilitation & Nursing Center, LLC, Park Avenue Extended Care Facility d/b/a Park Avenue Operating Company, LLC, South Point Plaza Nursing and Rehabilitation Center d/b/a Bayview Manor LLC, Spring Creek Rehab & Nursing Care Center d/b/a Willoughby Rehabilitation & Health Care Center LLC, The Hamptons Center for Rehabilitation and Nursing d/b/a North Sea Associates, LLC, Throgs Neck Rehabilitation & Nursing Center, and Townhouse Center for Rehabilitation and Nursing in claiming what is sought by the Complaint filed July 19, 2019 in Nassau County under Index number 609877/2019, and unites with the Plaintiffs in the relief demanded in the July 19, 2019 Complaint, along with the relief demanded by the Intervenor as hereinafter set forth.

1.      Intervenor repeats and realleges the paragraphs referenced by paragraph number from the Complaint in this matter filed July 19, 2019, as follows:

"1. This action concerns Defendant Philipson' s plain abuse of his fiduciary positions, managing member positions, and the trust placed in him to defraud Plaintiffs, engage in blatant self-dealing, and wrongfully divert over $53,000,000 into the account of an offshore insurance entity which he secretly formed.

Case 2:20-cv-06291-GRB-AKT   Document 1-3   Filed 12/29/20   Page 10 of 23 PageID #: 29

2. At all relevant times, Philipson held himself out to have an advanced understanding of insurance evaluation, sourcing and management, and was entrusted by Plaintiffs to evaluate their insurance needs, source appropriate insurance and manage insurance providers

3. Fundamentally, Philipson established a platform to defraud Plaintiffs on a recurring basis in three steps: First, Philipson caused Plaintiffs to withdraw approximately $2,900,000 which it had placed with a third-party risk retention group on the basis of fake concerns about the risk retention group's ability to fund its potential liabilities. Second, Philipson secretly set up a Bermuda-based insurance entity and diverted the withdrawn $2,900,000 into it. Third, Philipson enrolled Plaintiffs into his secretly formed insurance entity and led Plaintiffs to believe that they were insured entirely through third-party insurance providers. With the foundation of his fraudulent scheme intact, Philipson thereafter caused Plaintiffs to unknowingly pay supposed insurance premiums into his entity, for what Plaintiffs were led to believe was third-party insurance coverage, over a three-year period.

4. Until Philipson's fraudulent conduct was uncovered in or around January 2019, Plaintiffs had all along believed, based upon Philipson's representations, that they were insured entirely by highly-rated third-party insurance providers, that their premium payments were being paid to such high-rated third-party insurance providers, and that their premium payment amounts were the product of Philipson having competitively sourced their insurance coverage in the marketplace. Philipson concealed that the majority of their insurance coverage was being provided by his secretly-formed offshore entity, the majority of their premium payments were being diverted to his entity, and that Philipson alone set premium pricing based upon his calculation of how much funds he could wrongfully divert without his fraud being uncovered.

5. Philipson's fraudulent conduct began in 2015 and was discovered in or around January 2019 after his conduct became increasingly egregious. For example, in and around 2017, Philipson began to charge Plaintiffs for additional umbrella insurance policies that did not exist, and then funneled these fraudulently-obtained payments through his Bermuda-based insurance entity to allow the funds to be accounted for as premium payments for the purposes of tax avoidance, even though there was not risk transfer on the transaction.

6. Around the same time, the beginning of 2018, Philipson arranged for his son, defendant A vi Philipson, to form an insurance brokerage and then began to run his fraudulent scheme through this insurance brokerage so that defendant A vi Philipson could charge the Plaintiffs purported brokerage fees on the fraudulently-obtained premium payments.

7. When Philipson's ownership of the insurance entity in or around January 2019 was discovered by Plaintiffs, Philipson did not dispute that he secretly owned the insurance entity. Nor did Philipson dispute that the majority of Plaintiffs' premium payments had been diverted to his insurance entity rather than to third-party insurance providers. Philipson instead hurried to return portions of the fraudulent umbrella insurance premium payments which he collected. And, in an attempt to claim no harm, no foul, Philipson insisted that the premium payments which he had been charging Plaintiffs were always at or below market rate. But even this representation was a falsehood: Philipson was charging Plaintiffs for premium payments well in excess of market rate.

8. In total, Philipson perpetrated his fraudulent scheme from 2015 through the time that it was discovered in or around January 2019, and wrongfully collected over $53,000,000 in premium payments throughout this time.

9. In this action, Plaintiffs seek to recover the funds wrongfully diverted from them, disgorge the funds and profits wrongfully retained by Philipson, and remedy the harm done by not having had in place the insurance coverage with highly-rated third-party providers which Philipson had represented to be all along in place.

New York was the site and target of a substantial amount of the wrongful conduct that forms the basis of this Complaint.

Defendants

24. Defendant Bent Philipson is natural person who, at all relevant times herein, resided at 68 Highview Road, Monsey, New York 10952.25. Defendant A vi Philipson is natural person who, at all relevant times herein, resided at 68 Highview Road, Monsey, New York 10952.26. Defendant Deborah Philipson is natural person who, at all relevant times herein, resided at 68 Highview Road, Monsey, New York 10952.

FACTUAL ALLEGATIONS RELEVANT TO ALL CLAIMS

27. Defendant Bent Philipson is a member of each Plaintiff.

28. Defendant Bent Philipson is a managing member of each Bay Park, Nassau Rehabilitation, Park Avenue, Hamptons Center, Throgs Neck and Townhouse Center.

29. Through his wife, Deborah Philipson, who is identified as a managing member, Philipson acted as a de facto managing member of each Brookhaven Rehabilitation, Eastchester Rehabilitation, Golden Gate and Spring Creek. Though Deborah Philipson is identified as a managing member in each Brookhaven Rehabilitation, Eastchester Rehabilitation, Golden Gate and Spring Creek, she passed all of her managing member decisions and actions to Philipson.

30. At all relevant times, Philipson held himself out to have an advanced understanding of insurance evaluation, sourcing and management, and was entrusted by Plaintiffs to evaluate insurance needs, source appropriate insurance and manage insurance providers.

## PHILIPSON'S DIVERSION OF FUNDS INTO HIS SECRETLY-FORMED INSURANCE ENTITY

31. Through 2014, Plaintiffs were insured through a third-party risk retention group ("Third-Party RRG").

32. In or around the fall of 2014, Defendant Philipson told Benjamin Landa ("Landa"), member of each Plaintiff, that he had serious concerns about the ability of the Third-Party RRG to pay claims.

33. Philipson told Landa that the Third-Party RRG was underfunded.

34. Philipson told Landa that Plaintiffs were exposed to liability as a result of the Third Party RRG being underfunded.

35. Philipson told Landa that Plaintiffs should withdraw coverage with the Third-Party RRG and transfer the assets and liabilities to another insurer.

36. Philipson told Landa that he would procure better coverage, with a highly-rated third-party insurer.

37. On the basis of Philipson's representations, Plaintiffs agreed to effectuate Plaintiffs' withdrawal from the Third-Party RRG (the "Withdrawal"), resulting in the pay back of approximately $2,900,000 from the Third-Party

37. On the basis of Philipson's representations, Plaintiffs agreed to effectuate Plaintiffs' withdrawal from the Third-Party RRG (the "Withdrawal"), resulting in the pay back of approximately $2,900,000 from the Third-Party RRG

38. On the basis of his representation that Philipson would procure better coverage with a highly-rated third-party insurer, the $2,900,000 withdrawn from the Third-Party RRG was entrusted with Philipson for the purposes of procuring insuring coverage on behalf of Plaintiffs with a highly-rated third-party insurer.

39. Unknown to Plaintiff members, however: Philipson orchestrated the Withdrawal not because he had real concerns about the Third-Party RRG, but to instead to perpetrate his fraudulent scheme.

40. Though Philipson told Plaintiff members that he would procure highly rated insurance coverage with the $2,900,000 entrusted to him, Philipson did not have any intention of procuring higher-rated insurance coverage for Plaintiffs. He instead had the

undisclosed intention of using the $2,900,000 to fund his own offshore insurance entity. And in fact, did just that.

41. In or around January 2015, Philipson secretly formed a Bermuda-based insurance entity and deposited the $2,900,000 entrusted to him from the Withdrawal into it.

42. Thereafter, Philipson enrolled Plaintiffs into his insurance entity and led Plaintiffs to believe that Plaintiffs were insured entirely through third-party insurance providers.

43. In order to cause Plaintiffs to unknowingly pay supposed insurance premiums into his insurance entity, for what they thought was third-party insurance coverage, Philipson then arranged for a third-party insurance broker to invoice Plaintiffs for payments which Philipson misrepresented to be entirely for premiums owed to highly-rated third-party insurance providers.

44. In total, Philipson fraudulently invoiced and diverted over $53,000,000 million in premium payments, from the time that his fraudulent scheme began in or around the end of 2014through the time that it was discovered in or around January 2019.

PHILIPSON'S INCREASINGLY EGREGIOUS CONDUCT AND THE UNCOVERING OF HIS FRAUD

45. Philipson's fraudulent conduct was discovered in or around January 2019 after his conduct became increasingly egregious.

46. In and around 2017, Philipson began to charge some of the Plaintiffs for additional umbrella insurance policies that did not exist.

47. Philipson informed Plaintiffs that they needed to procure umbrella insurance, and then instructed Plaintiffs to make payment to his entity for such umbrella insurance, while representing his entity to be a third-party unrelated insurance company.

48. Philipson induced Plaintiffs to make supposed umbrella insurance premium payments throughout 2017 through 2018, without ever issuing any umbrella insurance coverage to them.

49. The fraudulently-obtained payments which Philipson received were funneled through his Bermuda-based insurance entity to allow for the funds to be accounted for as premium payments for the purposes of tax avoidance, even though there was not risk transfer on the transaction.

50. Around the same time, the beginning of 2018, Philipson arranged for his son, defendant Avi Philipson, to form an insurance brokerage and then began to run his fraudulent scheme through this insurance brokerage so that defendant A vi Philipson

could charge Plaintiffs a purported brokerage fee on the fraudulently-obtained premium payments.

51. When Philipson's ownership of the insurance entity was discovered in or around January 2019, Philipson did not dispute the existence of his entity.

52. Nor did Philipson dispute that the majority of premium payments that had been paid by Plaintiffs had been diverted to his entity rather than a third-party insurer.

53. In fact, Philipson immediately hurried to return the fraudulent umbrella insurance premium payments which he collected from Plaintiffs.

54. In addition, Philipson insisted that the premium payments which he had been all along charging Plaintiffs were at or below market

54. In addition, Philipson insisted that the premium payments which he had been all along charging Plaintiffs were at or below market rate.

55. Such representation was a falsehood: Philipson was all along charging Plaintiffs for premium payments that were in excess of market rate.

56. In total, Philipson perpetrated his fraudulent scheme from 2015 through the time that it was discovered in or around January 2019, and wrongfully diverted over $53,000,000million in funds throughout such time.

58. Defendant Philipson intentionally and knowingly made false statements of material fact to other members of Plaintiffs. The false statements of material fact include:

A. In or around October 2014, Philipson stated to Benjamin Landa ("Landa"), member of each Plaintiff, that he had reason to believe that the Third-Party RRG was underfunded and that Plaintiffs were exposed to liability as a result of the Third-Party RRG being underfunded;

B. In or around October 2014, Philipson stated to Landa that he would procure coverage entirely with a highly-rated third-party insurer if Plaintiffs withdrew insurance coverage with the Third-Party RRG;

C. In or around October 2014, Philipson represented to Landa that he would source and procure coverage based upon best pricing and coverage options after obtaining quotation from multiple different prospective providers;

D. In or around January 2015, Philipson stated to Landa that he had in fact procured insurance coverage on behalf of Plaintiffs with a highly-rated third-party insurance provider;

E. January 2015 through on or about January 2019, Philipson caused insurance invoices to be issued to each Plaintiff for premium payments supposedly entirely owed to a third party insurance providers;

F. In or around January 2019, after Philipson's fraudulent insurance scheme was uncovered, Philipson stated to Landa that he had been invoicing Plaintiffs for premium payments that were at or below market levels, and that his insurance entity was not collecting a surplus on the premium payments.

G. In or around 2018, Philipson told Plaintiffs that they had to pay for umbrella insurance, and collected premium payments from them for such supposed umbrella insurance.

59. Each of these and other material statements were false and known to be false when made:

A. Philipson did not actually believe that the Third-Party RRG was underfunded and that Plaintiffs were exposed to liability as a result of the Third-Party RRG being underfunded with respect to its potential liabilities;

B. Philipson did not intend on procuring insurance coverage entirely with a third party or third parties. Philipson instead intended on secretly using the funds withdrawn from the Third-Party RRG to fund his own insurance vehicle;

C. Philipson did not intend on and did not in fact source and procure coverage for Plaintiffs based upon his determination of best pricing and coverage options;

D. Philipson did not actually procure insurance coverage entirely through third-party providers.

E. Only a small fraction of the premium payments paid by the Plaintiffs were paid toward third-party insurance providers, and the majority of the premium payments were diverted to Philipson's secrete insurance entity.

F. All along, from 2015 through 2018, Philipson was invoicing Plaintiffs for premium payments substantially above markets rates for equivalent insurance.

G. Philipson had no intention of securing umbrella insurance for Plaintiffs. Philipson instead fraudulent induced Plaintiffs to make supposed umbrella insurance premium payments without providing any umbrella insurance.

60. In addition, Defendant Philipson omitted material fact in order to induce Plaintiffs to pay Premium Payments which he could direct into his own insurance entity. The omissions of material fact include that he

A. formed his own insurance entity and that his insurance entity was the insurance provider to Plaintiffs;

B. was the insurance provider to the Plaintiffs;

C. did not Conduct a competitive pricing analysis on the insurance coverage which he obtained on behalf of Plaintiffs

D. unilaterally set the cost of premiums invoiced to the Plaintiffs;

E. was charging the Plaintiffs for insurance premiums at above-market rates; and

F. and was earning a surplus on Plaintiffs premium payments.

61. Defendant Philipson made. these false and misleading statements and omissions for the purposes of inducing: (i) Plaintiffs to withdraw from insurance coverage with the Third-Party RRG and entrust Philipson with the approximate $2,900,000 in withdrawn proceeds; (ii) Plaintiffs to pay premium payments which Philipson could direct into his secret insurance entity; and (iii)Plaintiffs to pay premium payments above market rates.

62. If not for these or other false and misleading statements and omissions, Plaintiffs would not have agreed to withdraw from insurance coverage with the Third-Party RRG and entrust Philipson with the approximate $2,900,000 in withdrawn proceeds, and Plaintiffs would not have made the premium payments to Philipson's secret insurance entity.

63. These false and misleading statements and omissions caused Plaintiffs to be damaged in that they did not receive the insurance coverage they thought they had, overpaid for insurance coverage, and was wrongfully deprived of working capital and distributions which should have flowed to

65. At all relevant times, Defendant Philipson owed a fiduciary duty to each Plaintiff. Defendant Philipson was a member of each Plaintiff, held himself out to have an advanced understanding of insurance coverage and the insurance market, and was entrusted by Plaintiffs to source, procure and manage insurance coverage for Plaintiffs.

66. Defendant Philipson breached the fiduciary duty he owed to each Plaintiff, in furtherance of his self-dealing, self-interested transactions and scheme to defraud Plaintiffs.

67. Defendant Philipson breached the fiduciary duty he owed to each Plaintiff by, including but not limited to, failing to procure third-party insurance coverage for Plaintiffs, failing to competitively price and source insurance coverage for Plaintiffs, and wrongfully diverting funds away from Plaintiffs into his secretly-formed insurance entity.

FILED: ONEIDA COUNTY CLERK 10/20/2020 04:43 PM
Case 2:20-cv-06291-GRB-AKT   Document 1-3   Filed 12/29/20   Page 17 of 23 PageID #: 36

68. Plaintiffs' have been harmed by Defendants' breaches of fiduciary duty, including the payment of insurance premiums and brokerage commissions that were excessive and not for the third-party insurance coverage Plaintiffs thought they had obtained, the loss of working CapitaLand distributions which was wrongfully diverted into accounts controlled by Defendant Philipson, and the loss of corporate opportunities.

70. Philipson was enriched by the (i) the approximate $2,900,000 in proceeds withdrawn from the Third-Party RRG and diverted to his secrete insurance entity, and (ii) the $53,000,000 premium payments wrongfully diverted away from the Plaintiffs from 2015 through2018, and which were in excess of market rates.

71. Equity and good conscience requires Defendant Philipson to return the improper benefits he has retained.

73. Plaintiffs entrusted Defendant Philipson with approximately $2,900,000 in proceeds withdrawn from the Third-Party RRG for the purposes of procuring third-party insurance coverage with a highly-rated insurer, and paid $53,000,000 total premiums for the purpose of such third-party insurance coverage.

74. Defendant Bent Philipson wrongfully diverted the approximately $2,900,000 in proceeds withdrawn from the Third-Party RRG and the $53,000,000 premiums into an account controlled by him, and refuses to return such wrongfully diverted funds to Plaintiffs.75. As a direct and proximate result of Defendant Philipson's conversion, Plaintiffs have been harmed, including being deprived of working capital and distribution proceeds.

78. Defendant Philipson materially breached the fiduciary duties that he owed in order to wrongfully divert and convert funds away from Plaintiffs, and has wrongfully excluded Plaintiffs from access to records and information that would allow Plaintiffs to determine what he did with the wrongfully diverted funds. An accounting is therefore just and necessary.

79. Plaintiffs have made demands for Defendant Philipson to provide them with information that would allow them to account for the funds that he had wrongfully diverted and Defendant Philipson has refused to provide this information.

80. Plaintiffs have no adequate legal remedy to ascertain what was done with the funds which Defendant Philipson has wrongfully diverted, and an accounting is therefore necessary.

82. Defendant Bent Philipson is a managing member of each Bay Park, Nassau Rehabilitation, Park Avenue, Hamptons Center, Throgs Neck and Townhouse Center.

Case 2:21-cv-06291-GRB-ARL   Document 1-3   Filed 12/29/20   Page 18 of 23 PageID #: 37

83. Through his wife, Deborah Philipson, who is identified as a managing member, Philipson acted as a managing member of each Brookhaven Rehabilitation, Eastchester Rehabilitation, Golden Gate and Spring Creek. Though Deborah Philipson is identified as a managing member in each Brookhaven Rehabilitation, Eastchester Rehabilitation, Golden Gate and Spring Creek, she passed all of her managing member decisions and actions to Philipson.

84. The operating agreement of each Plaintiff Bay Park, Nassau Rehabilitation, Park Avenue, Hamptons Center, Throgs Neck, Townhouse Center, Brookhaven Rehabilitation, Eastchester Rehabilitation, Golden Gate and Spring Creek allows for a managing member to be removed from his or her managing member position in the event of wrongful conduct, such as fraud, deceit, willful misconduct, breach of fiduciary duty or a wrongful taking.

85. Defendant Bent Philipson has engaged in fraudulent, deceitful, willful misconduct in his role as a managing member in Bay Park, Nassau Rehabilitation, Park A venue, Hamptons Center, Throgs Neck and Townhouse Center and as a de facto managing member in Brookhaven Rehabilitation, Eastchester Rehabilitation, Golden Gate and Spring Creek, in breach of the fiduciary duties owed to Plaintiffs.

86. Removal of Bent Philipson as a managing member of Bay Park, Nassau Rehabilitation, Park Avenue, Hamptons Center, Throgs Neck and Townhouse Center; and Deborah Philipson of Brookhaven Rehabilitation, Eastchester Rehabilitation, Golden Gate and Spring Creek, she passed all of her managerial decisions and actions to Philipson is therefore appropriate.

88. Defendants Philipson and A vi Philipson agreed to defraud Plaintiffs so that they could each share in the wrongfully diverted premium payments.

89. Defendants each undertook overt acts in furtherance of the conspiracy to commit fraud. These overt acts include, among other things: (i) Defendant A vi Philipson setting up an insurance brokerage for the purpose of invoicing the Plaintiffs for supposed third-party insurance coverage; (ii) Defendant A vi Philipson issuing invoices to the Plaintiffs for supposed third-party insurance premiums; (iii) Defendant Avi Philipson diverting the premium payment proceeds into Defendant Philipson's secret insurance entity, and (iv) Defendant Philipson continuing to collect insurance premium payments into his insurance entity so that defendant A vi Philipson could take a portion of such payments as a purported brokerage fee.

90. As a direct and proximate result of Defendants' conspiracy· to commit fraud, Plaintiffs have been damaged, including the payment of insurance premiums and brokerage commissions that were excessive, not for the insurance coverage they thought they had obtained and wrongfully diverted away from them.

FILED: ONEIDA COUNTY CLERK 10/20/2020 04:43 PM INDEX NO. EFCA2020-001276
NYSCEF DOC. NO. 285                                                    RECEIVED NYSCEF: 10/20/2020

Case 2:20-cv-06291-GRB-AKT   Document 1-3   Filed 12/29/20   Page 19 of 23 PageID #: 38

92. Defendant Avi Philipson had knowledge of the fraudulent conduct alleged herein.

93. Defendants Avi Philipson provided substantial assistance to the commission of the fraudulent conduct for the purposes of promoting the fraudulent conduct. This substantial assistance by Avi Philipson included, among other things: (i) setting up an insurance brokerage for the purpose of invoicing Plaintiffs for supposed third-party insurance coverage; (ii) issuing invoices to the Plaintiffs for supposed third-party insurance premiums; and (iii) diverting Plaintiffs' premium payment proceeds into the account of Defendant Philipson's secret insurance entity.

94. As a direct and proximate result of Defendant Avi Philipson having aiding and abetted fraud, Plaintiffs have been damaged, including the payment of insurance premiums and brokerage commissions that were excessive, not for the insurance coverage they thought they had obtained and wrongfully diverted away from Plaintiffs and to accounts controlled by Defendants.

96. Defendant Avi Philipson had knowledge of the fiduciary duties owed by Defendant Bent Philipson to the Plaintiffs.

97. Defendant A vi Philipson engaged in a calculated effort to aid and abet Defendant Bent Philipson's breaches of fiduciary duty. Defendant Avi Philipson provided substantial assistance to effectuating Defendant Bent Philipson breaching his fiduciary duties, by, among other things, (i) setting up an insurance brokerage for the purpose of invoicing Plaintiffs for supposed third-party insurance coverage; (ii) issuing invoices to Plaintiffs for supposed third-party insurance premiums; and (iii) diverting Plaintiffs payments into an account controlled by Defendant Philipson.

98. As a direct and proximate result of Defendants Avi Philipson aiding and abetting Defendant Bent Philipson' s breach of fiduciary duties, Plaintiffs have been harmed, including the payment of insurance premiums and brokerage commissions that were excessive and not for the insurance coverage Plaintiffs thought they had obtained, the loss of working capital and distributions which was wrongfully diverted into accounts controlled by Defendant Philipson.

100. Defendants Bent Philipson and Avi Philipson each owed fiduciary duties to Plaintiffs: Defendant Avi Philipson owed a fiduciary duty to each Plaintiff as insurance broker to Plaintiffs. Bent Philipson owed a fiduciary duty to each Plaintiff.

101. Defendant A vi Philipson was aware of the fiduciary duties owed by Defendant Bent Philipson to Plaintiffs, and agreed to assist Defendant Bent Philipson breaches of fiduciary duty so that they can each share in the wrongfully diverted premium payments, and undertook overt acts in furtherance thereof. These over acts include, among other things: (i) Defendant Avi Philipson setting up an insurance brokerage for the purpose of

invoicing the Plaintiffs for supposed third-party insurance coverage; (ii) Defendant Avi Philipson issuing invoices to Plaintiffs for supposed third-party insurance premiums; (iii) Defendant Avi Philipson directing the premium payment proceeds into the account controlled by Defendant Philipson and (iv) Defendant Philipson continuing to collect insurance premium payments into his insurance entity.

102. As a direct and proximate result of Defendant Avi Philipson's agreement and actions to assist Defendant Bent Philipson breach his fiduciary duties, Plaintiffs have been damaged, including the payment of insurance premiums and brokerage commissions that were excessive, not for the insurance coverage they thought they had obtained and wrongfully diverted away from Plaintiffs and to accounts controlled by Defendants.

for an amount to be determined at trial but in excess of $53,000,000, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

J. On the Tenth Cause of Action compensatory damages in favor of Plaintiffs against Defendant A vi Philipson for an amount to be determined at trial but in excess of $53,000,000, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper."

Complaint "Dated: Carle Place, New York July 19, 2019"

2.     What has transpired is that immediately upon OCorp commencing actions

against the Employers as attached hereto in cases[1]:

| Exhibit 1 | NASSAU | EFCA 615390/2019 |
| Exhibit 2 | RICHMOND | EFCA 152540/2019 |
| Exhibit 3 | SCHENECTADY | 2019-2469 |
| Exhibit 4 | BRONX | EFCA 33061/2019E |
| Exhibit 5 | QUEENS | EFCA 718647-2019 |
| Exhibit 6 | NASSAU | EFCA 615382/2019 |
| Exhibit 7 | QUEENS | EFCA 718651-2019 |
| Exhibit 8 | SCHENECTADY | 2019-2470 |
| Exhibit 9 | WESTCHESTER | EFCA 68209-2019 |
| Exhibit 10 | SUFFOLK | EFCA 621892/2019 |
| Exhibit 11 | NASSAU | EFCA 615418/2019 |
| Exhibit 12 | NASSAU | EFCA 615476/2019 |
| Exhibit 13 | NASSAU | EFCA 615372-2019 |

---

[1] The list of cases has been modified from the original proposed complaint only to reflect the corresponding exhibits that were filed and uploaded to the docket in the original motion for intervention.

| Exhibit 14 | KINGS | EFCA 524009-2019 |
| Exhibit 15 | BRONX | EFCA 33057/2019E |
| Exhibit 16 | NASSAU | EFCA 615360-2019 |
| Exhibit 17 | RENSSELAER | 2019-264821 |
| Exhibit 18 | QUEENS | EFCA 718683-2019 |
| Exhibit 19 | WESTCHESTER | EFCA 68230-2019 |
| Exhibit 20 | KINGS | EFCA 524028-2019 |
| Exhibit 21 | NASSAU | EFCA 615348-2019 |
| Exhibit 22 | SUFFOLK | EFCA 621891_2019 |
| Exhibit 23 | BRONX | EFCA 33547_2019 |
| Exhibit 24 | NASSAU | EFCA 615286_2019 |
| Exhibit 25 | QUEENS | EFCA 718613-2019 |
| Exhibit 26 | BRONX | EFCA 33060_2019 |

to subrogate for the injuries sustained due to the unsafe workplace, negligence and culpability of the Plaintiffs/Employer-Defendants, within days of seeking recovery for the injuries which occurred to the injured Employees, the Plaintiffs/Employer-Defendants scrambled to take down their Complaint to recover $53 million for insurance fraud.

3.      The Employers have amended their complaint, removing the causes of action and facts setting forth fraud causing $53 million to be diverted by Philipson, replaced with a single cause of action for breach of a contract for money lent of $50,000, pretending that the $53 million causes of action do not exist, are gone, evaporated.

4.      Workers Compensation Law ("WCL") ¶§26, 26-a ,50 and 52 require that the Plaintiffs/Employer-Defendants provide security for the payment of workers compensation benefits, enforced by the Workers Compensation Board, the same as the security fund identified in the Risk Retention Complaint, as sought in the attached complaints on behalf of injured employees.

Case 2:20-cv-06291-GRB-AKT   Document 1-3   Filed 12/29/20   Page 22 of 23 PageID #: 41

5.      The Plaintiffs/Employer-Defendants are pretending that the $53 million Risk Retention fund described in the Employer's Complaint, is now actually a $50,000 breach of contract suit.

6.      OCorp as the Plaintiff in the attached complaints, subrogating to the Injured Employees, the Uninsured Employers Fund, and the Carrier, are unable to rely on the Plaintiffs/Employer-Defendants to protect the injured Employees from this obvious ruse, covering up the Risk Retention fund identified in the Complaint, a fund needed to secure the liability of the Employer's under WCL Law 50, 52, 26-a, and 26.

7.      By their actions in amending the complaint, it is obvious that the Plaintiffs/Employer-Defendants cannot be trusted to pursue and protect the Liability Risk Retention fund. Intervention is imperative. The parties to the recent lawsuits on behalf of the Injured Employees must intervene to prevent a miscarriage of justice by the attempted replacement of the $53 million Risk Retention fund with $50,000. The Plaintiffs/ Employer-Defendants cannot be trusted to protect and care for their injured Employees, therefore the need for this intervention.

8.      The diversion of funds is evident by the Cost Reports of the Plaintiffs/Employer-Defendants, as referenced in the  affidavit of CPA JL James submitted in support of the Intervention Motion.

9.      Attach are copies of the 27 complaints against each of the Plaintiffs/Employer-Defendants in the Complaint in Intervention.

10.     Immediately upon commencing actions against their Employer's for the injuries sustained due to the unsafe workplace, negligence and culpability of the

FILED: ONEIDA COUNTY CLERK 10/20/2020 04:43 PM
INDEX NO. EFCA2020-001276
NYSCEF DOC. NO.: 285
RECEIVED NYSCEF: 10/20/2020

Case 2:20-cv-06291-GRB-AKT   Document 1-3   Filed 12/29/20   Page 23 of 23 PageID #: 42

Employers, within days of seeking recovery for the injuries which occurred to the Employees, the Plaintiffs/Employer-Defendants scrambled to take down their Complaint to recover $53 million, removing the causes of action for fraud.

11.     Under WCL §10, Plaintiff/Employer-Defendants are liable to their employees to pay or provide compensation for their disability or death from injury arising out of and in the course of their employment, and WCL Law 50, 52, 26-a, and 26requires that the Plaintiffs/Employer-Defendants provide security to ensure payment for care and liability of their injured employees, enforced by the Workers Compensation Board. Here, the security fund is identified as the Risk Retention fund.

WHEREFORE, Intervening Plaintiff respectfully requests a judgment to access the security fund identified as the Risk Retention fund in the Complaint filed January 19, 2019 in Nassau County Action 609877/2019.

s/_____
Frank Policelli, Esq.
Attorney for Plaintiff in Intervention
Oriska Corporation
10 Steuben Park,
Utica, NY 13501
phone: (315) 235-1735